IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| E.C., a minor who sues by and through his parents and next friends, VICTOR CROCKER and TANGELA CROCKER, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CASE NO. 3:10-CV-759-WKW ) [WO] |
| CHILD DEVELOPMENT SCHOOLS, INC., | ) ) ) |
| Defendant. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff E.C., a minor who sues by and through his parents and next friends,

Victor Crocker and Tangela Crocker ("E.C."[1]), brings this Alabama tort action for

Wrongful Death of a Minor against Defendant Child Development Schools, Inc.

("C.D.S."). (Compl. (Doc. # 2, Ex. 1).) The case is before the court on C.D.S.'s

Motion for Summary Judgment (Doc. # 22), which has been fully briefed and is ready

for adjudication. C.D.S. argues that E.C. has not raised a genuine issue of material

fact on proximate causation to show that an act or omission by C.D.S. proximately

caused E.C.'s tragic death. Also before the court are C.D.S.'s two motions to strike

---

[1] In this opinion, E.C. is used to refer both to the name of the child as well as to his claim.

E.C.'s summary judgment response.  (Docs. # 35, 37.)

The first part of this opinion will address the challenges to the admissibility of E.C.'s summary judgment response.  The second part will discuss C.D.S.'s Motion for Summary Judgment.  Upon consideration of the parties' briefs, the relevant law, and the record as a whole, the court finds that C.D.S.'s motions to strike are due to be denied, and that C.D.S.'s Motion for Summary Judgment is due to be granted.

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. § 1332 and § 1441.  Personal jurisdiction and venue are not contested, and the court finds adequate allegations in support of both.

## II.  STANDARDS OF REVIEW

### A.    Motions to Strike[2]

C.D.S. filed two motions to strike.  In one, C.D.S. asserts that E.C.'s summary judgment response should be stricken as untimely.   In the other, C.D.S. raises evidentiary objections to three exhibits submitted by E.C. in opposition to the summary judgment motion.

---

[2] The Federal Rules of Civil Procedure authorize the filing of a motion to strike in limited circumstances, not applicable here.  *See* Fed. R. Civ. P. 12(e); *see also Luster v. Ledbetter*, No. 08cv551, 2009 WL 2448498 (M.D. Ala. Aug. 10, 2009) (explaining Rule 12(f) only applies to a pleading, not a brief).  Although the form of the motions is not grounded in a federal procedure rule, the substance of the motions will be considered.

### 1.    Timeliness

When an act may or must be done within a specific time, the court may, by motion of a party and for good cause, extend the time after it has expired if a party failed to act because of excusable neglect.  Fed. R. Civ. P. 6(b).  Excusable neglect is generally an "equitable inquiry" based upon the particular circumstances of the case. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). Excusable neglect encompasses situations in which the failure to comply with a filing deadline is attributable to negligence.  *Id.* at 394.  There are four factors pertinent to the determination:  "the danger of prejudice to the [opposing party], the length of the delay and its potential impact on the judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith."  *Id.* at 395.

### 2.    Evidentiary Objections

Only evidence that is admissible on its face or can be reduced to admissible form and that complies with Federal Rule of Civil Procedure 56(e) will be considered. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986); *Macuba v. DeBoer*, 193 F.3d 1316, 1322–24 (11th Cir. 1999).

**B.**   **Summary Judgment**

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*) (citation and internal quotation marks omitted); *see* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–24.

If the movant meets its evidentiary burden, the burden shifts to the non-moving party to establish, with evidence beyond the pleadings, that a genuine issue material

to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); Fed. R. Civ. P. 56(c). What is material is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)*; see also Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). "Speculation does not create a *genuine* issue of fact . . . ." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (internal quotation marks and citation omitted). "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party."

*Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citations omitted).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*) (A plaintiff's "conclusory assertions . . . in the absence of supporting evidence, are insufficient to withstand summary judgment."). Thus, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

On summary judgment, the facts must be viewed in the light most favorable to the non-movant. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). Thus, "'facts, as accepted at the summary judgment stage of the proceedings, may not be the

actual facts of the case.'" *Id.* (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)).

## III.  BACKGROUND

Construed in the light most favorable to E.C. as the non-moving party, the facts are as follows.

On August 8, 2008, E.C., an eight-month-old child, was dropped off at Childcare Network, a daycare service provided by C.D.S.  (Compl. ¶¶ 1, 6.)  That morning, E.C. was "feeling bad" when he was dropped off at Childcare Network. (T. Crocker Dep. 88 (Doc. # 22, Ex. A).)  Mrs. Crocker informed the daycare workers at Childcare Network that E.C. was not feeling well and requested that they call her if necessary.  (T. Crocker Dep. 89.)  Mrs. Crocker was contacted by an employee of Childcare Network about E.C. at approximately 1:00 p.m. on August 8, 2008. (T. Crocker Dep. 54.)  She was told that E.C. was "unresponsive" or "not responding." (T. Crocker Dep. 115, 116.)  There was nothing in the tone of the voice of the daycare employee that would indicate this was an emergency situation.  (T. Crocker Dep. 117.)

As soon as she arrived, Mrs. Crocker could tell E.C. was in a very serious medical condition, unresponsive to stimulus, with discolored lips, dazed eyes, and a limp body.  (T. Crocker Aff. ¶ 9 (Doc. # 33, Ex. A).)  Mrs. Crocker left the daycare at 1:23 p.m. and rushed E.C. to the Columbus Regional Medical Center.  (T. Crocker

Aff. ¶¶ 7–8.)  At the hospital, E.C. was pronounced dead at 2:17 p.m., less than an hour after he was picked up.  (T. Crocker Aff. ¶ 8.)

The cause of death was later determined to be the result of diffuse active myocarditis, a rare viral infection of the heart.  (Forensic Science Report (Doc. # 22, Ex. B).)  Myocarditis is a medical condition where the muscular walls of the heart become inflamed, resulting in poor heart function.  (Dr. Pearce Aff. ¶ 4 (Doc. # 22, Ex. C).)  Although there are many potential causes of myocarditis, it is primarily a viral illness which infects the heart.  (Dr. Pearce Aff. ¶ 4.)  Myocarditis is difficult to diagnose and extremely rare.  (Dr. Pearce Aff. ¶ 7.)  It is the opinion of the only medical expert witness that E.C.'s myocarditis was "so severe that earlier activation of emergency medical services the day of his death would not have prevented his death.  At a minimum, emergency medical services would have to have been activated twenty–four hours earlier for E.C. to have any chance of survival."  (Dr. Pearce Aff. ¶ 8.)

E.C. filed an action for Wrongful Death of a Minor[3] in state court, which was removed to this court on September 9, 2010.  E.C. claims that C.D.S. was negligent in failing to call emergency services or give life saving care to E.C. while he was in

---

[3] C.D.S. refers to E.C.'s claim as a "wrongful death action . . . falling under Ala. Code § 6-5-410," but the claim is construed as arising under Ala. Code § 6-5-391, which is the code section applicable to a deceased minor child, as opposed to the generic wrongful death tort action.

C.D.S.'s care on the morning of August 8, 2008.  E.C. seeks punitive damages of five million dollars against C.D.S.

E.C. did not disclose an expert witnesses by the deadline established in the Uniform Scheduling Order, and there is no indication that E.C. has attempted to find an expert medical witness.  In short, E.C. has not retained an expert who has offered a medical opinion on the proximate cause of death.

## IV.  DISCUSSION

### A.  <u>Motions to Strike</u>

#### 1.  *Timeliness*

On June 15, 2011, C.D.S. timely filed its Motion for Summary Judgment within the deadline set by the court.  Pursuant to the General Briefing Order, all responses to dispositive motions were due twenty–one days after the motion was filed.  (General Briefing Order, ¶ 2 (Doc. # 13).)  E.C.'s response was due on July 6, 2011, but was not filed until August 10, 2011, over a month late.  (Docs. # 32, 33.)  E.C. did not file a motion requesting an extension of time to respond to the summary judgment motion.

Along with E.C.'s submission to chambers of a courtesy copy of his response, E.C.'s attorney, Joseph Wiley, Jr. (Mr. Wiley), submitted a cover letter.  That cover letter, which was not filed, contained the representation that Mr. Wiley was "out of the office on an extended period due to an illness" while the Motion for Summary

Judgment was pending.  (Letter of transmission of Joseph Wiley, Jr. (Aug. 10, 2011).) This justification was not reasserted in E.C.'s response to the motion to strike.  The letter also requested that the court accept the late response.

C.D.S. moved on August 11 to strike the response as untimely.  (Def.'s Mot. to Strike (Doc. # 35).)  E.C. was ordered to respond to the motion to strike on August 12, 2011.  (Order (Doc. # 36).)  Mr. Wiley's response explained that, "from a period of mid June [sic] through July we discovered that our e-mail system had developed a malfunction and was therefore not receiving some e-mail transmissions while at the same time other e-mails were received without any problem."  (Pl.'s Resp. To Mot. to Strike ¶ 3 (Doc. # 40).)  Mr. Wiley also averred that the e-mails from the "Middle District Court in Alabama" were not coming through.  (Pl.'s Resp. to Mot. to Strike ¶ 4.)  As a result of not receiving the e-mail from the court, he claimed that he was unaware that a motion for summary judgment had been filed.  (Pl.'s Resp. to Mot. to Strike ¶ 5.)  Mr. Wiley also represents that he had not missed a deadline, or failed to file a timely response, in the last five years.  (Pl.'s Resp. to Mot. to Strike ¶¶ 1, 2.)

Accompanying this explanation were three exhibits, consisting of two e-mail error messages dated July 14, 2011, and a service report, as well as an affidavit from Mr. Wiley's paralegal, Ms. Bass, explaining that Mr. Wiley's e-mail system was "not receiving certain messages."  (Bass Aff. ¶ 3 (Doc. # 40, attach. 2).)  Mr. Wiley stated

that documentation regarding messages from this court could not be provided.  (Pl.'s Resp. to Mot. to Strike ¶ 7.)  Exhibits A, B, and C reveal that the error the e-mail system was experiencing was a full inbox.  This problem was corrected when Ms. Bass deleted some of the messages already in the system.  (Doc. # 40, Exs. A, B, C.)  The exhibits that showed the e-mail error occurred on July 14, 2011.  (Doc. # 40, Exs. A, B.)

The first issue is whether to accept the response filed by E.C.  Federal Rule of Civil Procedure 6(b)(1)(B) provides that "the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect."[4]  This court will construe E.C.'s summary judgment response (Doc. # 33) and E.C.'s later response to the court's order (Doc. # 40) as containing a motion to extend a lapsed deadline.

Four factors inform the analysis of whether excusable neglect is met:  (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in

---

[4] As part of this inquiry, there is no need to determine the distinction, if any, between the "good cause" requirement and the "excusable neglect" requirement imposed by Rule 6(b)(1)(B). *See Sweetwater Invs., LLC v. Sweetwater Apartments Loan, LLC*, No. 1:10cv223, 2011 WL 1545076, at *2 n.2 (M.D. Ala. Apr. 25, 2011).  No argument has been made or authority cited that would foreclose a finding of good cause on this record.

good faith.  *See Pioneer Inv. Servs. Co.*, 507 U.S. at 395.

First, there does not appear to be a danger of prejudice to C.D.S.  To establish prejudice, the delay from the pleadings must "result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion."  10 C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure*, § 2699 at 536-37 (2d ed. 1983).  C.D.S. does not claim to have suffered from any harm that would rise to the level of prejudice.  No evidence had been lost; no action had been taken by the court on C.D.S.'s Motion for Summary Judgment when the response was filed; and no argument has been made that C.D.S. was subjected to any fraud from the failure to file on time.

Second, the length of the delay and its potential impact on the judicial proceeding is considered.  A delay of over a month, while significant, did not have an impact on the proceeding.  The trial deadline was not moved as a result of the delay, and the consideration and disposition of C.D.S's Motion for Summary Judgment was not unduly delayed by the lateness of the response.

Third, the court considers the reason for the delay, including whether it was within the reasonable control of the movant.  Mr. Wiley's evidence on the cause for the delay is the digital age equivalent of "the dog ate my homework."  Mr. Wiley claims that e-mail difficulties prevented discovery of C.D.S.'s pending motion, but

this evidence demonstrates that these difficulties were entirely self-created.  The documentation shows that the e-mail difficulties were the result of inadequate data storage space in the e-mail inbox, due to a failure to delete messages and clear data space when the service was at capacity.  (Doc. # 40, Ex. C.)  An inability to manage an office e-mail system to properly receive notices of filing does not qualify as excusable neglect.

Even if such technological failings amounted to excusable neglect, the evidence provided by Mr. Wiley does not establish that the difficulties experienced affected notice of the filing of C.D.S.'s Motion for Summary Judgment.  The documentation only shows that an error was experienced on July 14, 2011.  The court will rely on Mr. Wiley's representation that this problem with an overflowed inbox was occurring more than a month earlier on June 15, 2011, when C.D.S.'s Motion for Summary Judgment was filed.[5]  Even accepting such a representation, it does not appear that excusable neglect has been established for the following reason:  an attorney's responsibility to stay updated on the activity in his case extends beyond simply checking e-mail.

---

[5] The court takes this opportunity to wonder how many other members of the bar would be able to go a month with disrupted access to e-mail, considering the way modern attorneys are chained to their mobile devices, much as Jacob Marley was chained to his "cash-boxes, keys, padlocks, ledgers, deeds, and heavy purses wrought in steel."  Charles Dickens, *A Christmas Carol* 26 (1843).

Attorneys have a duty to stay apprised of their client's cases. *See, e.g.*, *Robinson v. Wix Filtration Corp.*, 599 F.3d 403, 413 (4th Cir. 2010) (holding that counsel could not rely on e-mail difficulties to demonstrate excusable neglect, because counsel's "calculated decision . . . to deliberately refrain from any attempt to ascertain whether summary judgment motions were filed on the date he knew they were due . . . cannot be characterized as 'excusable neglect.'"); *Soliman v. Johanns*, 412 F.3d 920, 922 (8th Cir. 2005) (holding that "a litigant who invokes the processes of the federal courts is responsible for maintaining communication with the court during the pendency of his lawsuit"); *Easley v. Kirmsee*, 382 F.3d 693, 698 (7th Cir. 2004) (noting that "attorney inattentiveness to litigation is not excusable, no matter what the resulting consequences the attorney's somnolent behavior may have on a litigant"); *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 357 (5th Cir. 1993) (holding that "[a] party has a duty of diligence to inquire about the status of a case"); *Gibson-Michaels v. Bair*, 255 F.R.D. 306, 307 (D.D.C. 2009) (finding that failure to receive notice of filing did not absolve counsel of his "affirmative duty to stay apprised of the status of the case").

This district's local rules impose no lesser obligation. They provide that service through the Electronic Case Filing system is effective upon transmission of the notice. M.D. Ala. Civ. R. 5.4. Counsel had constructive notice of the summary judgment

motion, as well as a professional obligation to stay apprised of the case *even if* there was a failing with his technology that caused him to miss an e-mail.  Actual notice of this motion could have been had by using the PACER system, by calling the court or opposing counsel, or by invoking any of the myriad ways available to learn what was occurring in the case.  It appears that an opportune time to note that the motion was pending and communicate his error to the court was on July 19, 2011, when Mr. Wiley used the court systems to file interrogatories, which were later removed pursuant to local rule 26.3.  That date was five days after noticing and correcting the e-mail problem, and was two weeks after the summary judgment response deadline. Unfortunately, the delay in filing continued.

A response to the summary judgment motion did not surface until August 10, 2011.  With E.C.'s response came an unfiled cover letter, explaining that Mr. Wiley had been out of the office for an extended period due to illness, and was unaware of the issues with the e-mail and the pendency of C.D.S.'s motion.  The representation of illness, but not the entirely preventable issues with e-mail and failure to stay appraised of the status of the case, provides a ground that is finally sufficient to justify the delay in filing.  Based on the representation of a serious illness, the court finds that there is an acceptable reason for the delay.

The final *Pioneer* factor is whether the movant acted in good faith.  Accepting the representations of Mr. Wiley as an attorney and officer of the court, the court finds that he did act in good faith, even if it was tempered with a lack of diligence and disregard for the deadlines and procedures of this court.

Thus, considering the lack of prejudice to C.D.S., the low impact on the proceedings, and the representations of counsel that his delay was caused, at least in part, by a significant illness, the court finds the factors necessary to establish excusable neglect, so that E.C.'s Response to the Motion for Summary Judgment will be considered.

### 2.    *Evidentiary Objections*

C.D.S. also filed a motion to strike portions of E.C.'s evidentiary submission. (Def. Mot. to Strike Evid. (Doc. # 37).)  E.C.'s response included an affidavit by Tangela Crocker, the deceased child's mother; the report of the police investigation into E.C.'s death; and the autopsy report.  (Doc. # 33, Exs. A, B, C.)  C.D.S. argues that paragraphs 9 & 10 of Tangela Crocker's Affidavit should be stricken, to the extent that those paragraphs are offering expert testimony.  The contested portions are as follows.  Paragraph 9 states "[a]lthough I do not have any formal medical training, I have raised one child prior to E.C. And I am generally aware that if any person is grasping for air and losing . . . natural skin color, you should call 911 and maybe start

16

C.P.R."  (T. Crocker Aff. ¶ 9 (Doc. # 33, Ex. A.)  Paragraph 10 continues:

> I am of the strong opinion that upon telling the daycare center on the
> morning of E.C. [sic] death that he was ill and needed to be watched
> closely and the fact that they [sic] had a legal duty to call emergency
> medical care should the need arise makes them responsible for E.C. [sic]
> death.

(T. Crocker Aff. ¶ 10.)

Turning to the evidence subject to the motion, the issues concerning the
affidavit by Tangela Crocker, the police investigation and the autopsy report are easy
to resolve, given the narrow issue of proximate cause that is contested in the motion
for summary judgment.

C.D.S.'s first objection is to paragraphs 9 and 10 of Tangela Crocker's
affidavit. C.D.S. argues that both paragraphs contain impermissible expert testimony.
(Def. Mot. to Strike Evid. ¶¶ 1, 2.)  E.C. never argues that Tangela Crocker is a
medical expert.  The affiant herself states that she is not a medical expert.  (T. Crocker
Aff. ¶ 9.)  As this is a lay opinion, the strictures of Federal Rule of Evidence 701
govern, not Rule 702.  Because this affiant is not seeking to testify as a Rule 702
witness, the Motion to Strike paragraphs 9 and 10 will be denied as moot.     C.D.S.
also moves to strike exhibits B and C of E.C.'s response, arguing the documents are
unauthenticated and contain hearsay.  (Def. Mot. to Strike Evid. ¶¶ 3, 4.)  Reaching
a conclusion on the admissibility of these exhibits is unnecessary for examining

proximate cause, the pivotal issue, as neither exhibit provides evidence that an act or omission by C.D.S. was the proximate cause of his death.  For the reasons detailed in the discussion on summary judgment, *infra*, the Motion to Strike Exhibits B & C will be denied as moot.  The court turns to whether summary judgment is appropriate.

**B.**     **Motion for Summary Judgment**

After a thorough review of the evidence, C.D.S.'s motion, and E.C.'s response, the court finds that C.D.S.'s motion for summary judgment is due to be granted on all claims.

E.C.'s theory of the case is that C.D.S.'s employees were negligent in the care that they gave to E.C. on August 8, 2008.  (Compl. 4–5.)  C.D.S. argues that E.C.'s claim cannot proceed, because E.C. offers no evidence that shows that any act or omission of C.D.S. was the proximate cause of E.C.'s death.   C.D.S. is only challenging the element of causation.  On the other hand, the most favorable reading of E.C.'s claim is that C.D.S.'s employees should have called 911 or given E.C. cardiopulmonary resuscitation (Pl.'s Summ. J. Resp. 4, 5) and other "life sustaining measures" (Pl.'s Summ. J. Resp. 4).  The question is whether the evidence raises a genuine issue of material fact that E.C.'s death was proximately caused by C.D.S.'s failure to call 911 or begin CPR or other treatment while E.C. was at the daycare on August 8, 2008.

E.C.'s claim has two flaws.  First, E.C. does not present any admissible evidence to show that there was anything anyone at the daycare could have done to save E.C.'s life.  Instead, all E.C. presents on this point is conjecture and speculation. Second, the only medical expert presents unrebuked testimony that it was already too late for emergency services to do anything to save E.C., given the severity of his condition.  In short, it did not matter what C.D.S. did or did not do; the only admissible evidence before the court establishes that it was sadly too late to save E.C.'s life even before he was brought to the daycare on August 8, 2008.  The reasons for these conclusions are as follows.

Under Alabama law, negligence requires proof of a duty, breach of that duty, proximate causation of an injury, and damages.  *See Crowne Invs., Inc. v. Bryant*, 638 So. 2d 873, 878 (Ala. 1994); *see also Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1992). "The proximate cause of an injury is the primary moving cause, without which, it would not have occurred, but which, in the natural and probable sequence of events, produces the injury."  *City of Mobile v. Havard*, 268 So. 2d 805, 810 (Ala. 1972). "The proximate cause of a negligent injury is established where an injury is the natural and probable consequence of the negligent act or omission (or a direct wrongful act) which an ordinary prudent person ought reasonably to foresee would result in injury." *Peevy v. Ala. Power Co.*, 393 So. 2d 971, 973 (Ala. 1981); *see also Morgan v. City*

*of Tuscaloosa*, 108 So. 2d 342, 346 (Ala. 1959) (The "proximate cause" of an injury is the primary moving cause without which it would not have been inflicted, but which, in the natural and probable sequence of events, and without the intervention of any new or independent cause, produces the injury.).

The act and the injury must be sufficiently connected to make the act the proximate cause of the injury. *See Littleton v. Ala. Power Co.*, 10 So. 2d 757, 758 (Ala. 1942). To demonstrate this connection, the act and injury must be known by common experience to be naturally and reasonably in sequence, or the injury must follow in the ordinary sequence of events from the act. *Id.* The question of proximate cause is typically one for the jury to decide. *See Davison v. Mobile Infirmary*, 456 So. 2d 14, 24 (Ala. 1984). A court should grant summary judgment only when "there is a total lack of evidence from which the factfinder may reasonably infer a direct causal relation between the culpable conduct and the resulting injury." *Id*.

The proximate cause analysis applies in an Alabama wrongful death action. "Under Alabama's Wrongful Death Statute, [the plaintiff] must prove as a part of her prima facie case that the Defendant's actions were the actual and proximate cause of the injuries alleged." *Gilliam v. City of Prattville*, 667 F. Supp. 2d 1276, 1299 (M.D. Ala. 2009) (citing *DiBiasi v. Joe Wheeler Elec. Membership Corp.*, 988 So. 2d 454, 460 (Ala. 2008)), *reversed on other grounds*, 639 F.3d 1041 (11th Cir. 2011). It is not

enough to show that a child was sick, was not given treatment, and then suffered injury as a result.  To prove proximate cause, the lack of treatment must, in the natural sequence of events, cause the injury.  Thus, the question to be resolved is whether, at any point when E.C. was in C.D.S.'s care, there is evidence that creates a genuine issue of material fact that calling 911 or beginning CPR or other treatment at the daycare would have prevented his death.  In other words, is there evidence sufficient to create a jury issue that, but for the fact that C.D.S. did not call 911 or treat him at the daycare that morning, E.C. would have lived?

The undisputed facts show that E.C. died from diffuse active myocarditis. (Forensic Science Report.)  E.C. agrees that this is the cause of E.C.'s death.  (Pl.'s Summ. J. Resp. 4 (stating that the "ultimate cause of death" is "clearly from a heart infection").)  E.C. attempts to frame the issue as whether "such facts were present that life sustaining measures should have been taken by Defendant [sic] employees."  (Pl.'s Summ. J. Resp. 4.)  Given the cause of death, the true issue is whether there were any life sustaining measures that *could* have saved E.C. from dying from diffuse active myocarditis.  The closest E.C. comes to arguing the causal link is the claim that, "[i]f E.C. had received proper emergency care, he may still be alive today."  (*Id.* at 6.)  This statement is speculative and conclusory, and does not suffice to meet E.C.'s burden to establish that a genuine issue of material fact exists as to proximate causation.  *See*

21

*Cordoba*, 419 F.3d at 1181 ("Speculation does not create a genuine issue of fact . . . .).

No favorable inferences can be drawn from the evidence in the record that would create a jury issue that C.D.S. proximately caused E.C.'s death.  The timing of E.C.'s death, shortly after he left C.D.S.'s care, is not sufficient to raise a jury issue as to proximate cause.  *See Wingster v. Head*, 318 F. App'x. 809, 815–16 (11th Cir. 2009) (affirming grant of summary judgment because, without expert medical testimony, "mere temporal proximity alone" cannot refute specific medical evidence that a person's death resulted from natural causes).  Nor can E.C.'s mother, Tangela Crocker, establish medical causation as a lay witness or  provide evidence that could be used as the basis for an inference of medical causation.  All E.C.'s mother offers are her observations of E.C.'s physical condition shortly before his death, and her belief that C.D.S. is to blame.  (T. Crocker Aff. ¶¶ 9, 10.)  However, neither her observations nor her opinions are competent bases to establish the medical cause of E.C.'s death.  That is so because *expert medical testimony*, and not lay testimony, is required to demonstrate proximate cause, given the complexity of E.C.'s heart condition.  "[M]edical causation is a technical and scientific issue that requires the specialized knowledge of an expert medical witness."  *Gilliam,* 667 F. Supp. 2d at 1299 (citing *Wingster,* 318 F. App'x. at 815–816) (interpreting the requirements of

Fed. R. Evid. 702); *see also Webster v. Offshore Food Serv.*, 434 F.2d 1191, 1193 (5th Cir. 1970)[6] (holding that summary judgment is appropriate when "the trier of fact would not be at liberty to disregard arbitrarily the unequivocal, uncontradicted and unimpeached testimony of an expert witness [whose] . . . testimony bears on technical questions of medical causation beyond the competence of lay determination").

Only one side offers expert medical testimony on the cause of death, diffuse active myocarditis. C.D.S. offers the testimony of Dr. Frank Bennett Pearce, who is a pediatric cardiologist associated with the University of Alabama at Birmingham (UAB). (Dr. Pearce Aff. ¶ 2.) Dr. Pearce is board-certified in pediatrics with a sub-board certification in pediatric cardiology. (Dr. Pearce Aff. ¶ 2.)

E.C. challenges the admissibility of Dr. Pearce's expert opinion on proximate cause. Not only is E.C.'s argument cursory and undeveloped, it is not supported by the record. Federal Rule of Evidence 702[7] governs the admissibility of expert

---

[6] The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions decided prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

[7] Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

testimony.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–92 (1993).

As the Supreme Court made clear in *Daubert*, Rule 702 compels the district court to

perform a "gatekeeping" function concerning the admissibility of expert testimony to

ensure that speculative and unreliable opinions do not reach the jury.  *Daubert*, 509

U.S. at 589 n.7.  In the Eleventh Circuit, expert testimony is admissible under Rule

702 if it satisfies three broad requirements:

> (1) the expert is qualified to testify competently regarding the matters he
> intends to address; (2) the methodology by which the expert reaches his
> conclusions is sufficiently reliable as determined by the sort of inquiry
> mandated by *Daubert*; and (3) the testimony assists the trier of fact,
> through the application of scientific, technical, or specialized expertise,
> to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting City of

*Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1999)).

The proponent of the expert testimony bears the burden of satisfying the

requirements of Rule 702 by a preponderance of the evidence and thereby proving the

testimony's admissibility.  *Id.*  The first test under Rule 702 is whether the witness

offering the expert testimony is qualified.  The decision is case specific and therefore

lies within this court's discretion.  Nevertheless, Rule 702 offers a framework for

evaluating a witness's qualifications by providing that expertise must be established

---

by one or more of the following:  "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.

The second test under Rule 702 is whether the expert testimony is reliable. When evaluating the reliability of scientific or medical expert testimony, the trial judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.  To evaluate the reliability of a scientific expert opinion, a court considers several factors:  (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the known or potential rate of error of the methodology is acceptable; and (4) whether the theory is generally accepted in the proper scientific community.  *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 593–94).  "The trial judge [has] considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Dr. Pearce is a professor of pediatrics at UAB Medical School, has over twenty years of experience in pediatrics, is board certified in pediatrics and pediatric cardiology, and has published numerous academic writings in the field of pediatric

cardiology.  (*See* Curriculum Vitae of Frank B. Pearce, M.D. (Doc. # 22, Ex. C, 6–17).)  Dr. Pearce is qualified to testify competently about pediatric heart disease. Based upon Dr. Pearce's training, education and experience, and his review of the autopsy report and the information contained within, Dr. Pearce was able to come to a conclusion about the pathology of the very rare heart disease that E.C. had, diffuse active myocarditis.  (Dr. Pearce Aff. ¶¶ 3, 7–10.)  Given the unique and rare nature of this disease, and the extensive background Dr. Pearce has in pediatric cardiology, the court finds that his opinion is reliable.

Significantly, E.C. offers no evidence to challenge Dr. Pearce's qualifications. Nevertheless, E.C. attacks the testimony Dr. Pearce offers.  None of E.C.'s arguments are persuasive.  First, E.C. argues that expert testimony is not required to resolve E.C.'s claim.  (Pl.'s Summ. J. Resp. 1, 4–6.)  It is uncontested that E.C.'s death was caused by a heart virus, diffuse active myocarditis.  The pathology of that disease is beyond lay witness determination.  The complexity of such a condition requires expert medical testimony to explain the particulars of that disease, such as how the disease affects the heart, how it causes death, and what treatments, if any, would have been effective in treating it.

Second, E.C. argues that Dr. Pearce did not have a foundation to issue an opinion since he did not encounter E.C. on the day he died, or perform the autopsy,

and that it is impossible to make a conclusion about "the uncertain Nature [sic] of human life." (Pl.'s Summ. J. Resp. 5–6.) Dr. Pearce has offered evidence to show that he is familiar with the progression and pathology of diffuse active myocarditis, and can speak to the uniqueness of that disease, which informs his diagnosis. Dr. Pearce has demonstrated that he is sufficiently trained in his field of expertise, pediatric cardiology, to be able to speak meaningfully to the jury about cause-of-death and manner-of-death issues relevant to this rare disease and the results of the autopsy report.

E.C. has not produced any expert witness or other competent evidence to refute Dr. Pearce's attestations: "E.C.'s myocarditis was so severe that earlier activation of emergency medical services the day of his death would not have prevented his death. At a minimum, emergency medical services would have had to have been activated *twenty–four hours earlier* for E.C. to have had any chance of survival." (Dr. Pearce Aff. ¶ 8., emphasis supplied.) When confronted with a reliable expert witness and his unimpeached opinion, the court is compelled to grant summary judgment on the issue of causation. *See Webster*, 434 F.2d at 1193 (stating that summary judgment is appropriate when "the trier of fact would not be at liberty to disregard arbitrarily the unequivocal, uncontradicted and unimpeached testimony of an expert witness [whose]

testimony bears on technical questions of medical causation beyond the competence of lay determination").

In summary, without expert medical testimony, E.C. cannot show that a genuine issue of material fact exists as to the cause of E.C.'s death.  E.C. has offered no expert witness on the issue of causation.  The only expert testimony comes from Dr. Pearce.  Dr. Pearce's unrefuted testimony establishes that no act or omission by C.D.S. would have changed the outcome of the advanced stage heart disease that claimed E.C.'s life on August 8, 2008.  E.C.'s summary judgment opposition consists only of speculation that some medical treatment could have saved his life from his heart condition.  There is no evidence that any act or omission of C.D.S. could have prevented the tragedy that befell the Crocker family.  Applying Alabama's substantive law of torts and the federal procedural law governing summary judgment, there is no evidence that creates a *genuine* issue of material fact on proximate causation.  C.D.S.'s motion for summary judgment is due to be granted.

## V.  CONCLUSION

Accordingly, it is ORDERED that C.D.S.'s Motion to Strike is DENIED (Doc. # 35), that C.D.S.'s Motion to Strike Portions of the Plaintiff's Evidentiary Submission is DENIED as moot (Doc. # 37), and that C.D.S.'s Motion for Summary Judgment (Doc. # 22) is GRANTED.  An appropriate judgment will be entered.

DONE this 29th day of September, 2011.

_____/s/ W.  Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE